## MOORE *v.* SMITH.

1. The election for members of Congress and presidential electors, required by law to be held on Tuesday after the first Monday in November, is a general election within the meaning of article 13, section 1, paragraph 1, of the constitution of this State.
2. The constitutional provision (art. 11, sec. 1, par. 2) limiting the number of counties may be amended by a proposal to create an additional county, to be ratified by the people in the manner provided in the constitution, without having previously submitted an amendment for enlarging the number of the counties.
3. There was no error in denying a discharge in this case under the writ of habeas corpus.

NOVEMBER 12, 1913.

Habeas corpus. Before Judge James B. Park. Baldwin superior court. September 22, 1913.

*W. L. & Warren Grice* and *M. B. Calhoun,* for plaintiff.

*W. A. Wooten, W. S. Mann, Eschol Graham,* and *C. P. Thompson,* for defendant.

ATKINSON, J. The writ of error complains of the ruling of the judge refusing to discharge Marshall Moore from the custody of the warden at the State Penitentiary on a writ of habeas corpus. Moore was regularly convicted of murder in the superior court of Wheeler county, and sentenced to the penitentiary for life. The ground upon which it was sought to have him discharged was that the establishment of the County of Wheeler was in violation of the constitution of the State, and the court proceeding was without authority of law, and the conviction void.

1. An act was approved on August 14, 1912 (Acts of 1912, p. 41), proposing an amendment to article 11, section 1, paragraph 2, of the constitution of this State, as amended in 1904, so as to create a new county to be known by the name of Wheeler. The act described the boundaries of the proposed county, fixed the location of the county site, and contained other provisions relating to the organization of the county. Section two of the act was as follows: "Be it further enacted, That when this proposed amendment shall be agreed to by two thirds of the members elected to each of the two houses composing the legislature of the State of Georgia, such proposed amendment shall be entered upon the Journal of each house with the yeas and nays thereon; and the Governor is hereby directed to cause the said proposed amendment to be published in one or

more newspapers in each congressional district, at least two months before the time of holding the next general election to be held on Tuesday after the first Monday in November of the year 1912; and he shall also provide a submission of the proposed amendment at said general election. And if the people shall ratify such amendment by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment shall become a part of the constitution of Georgia." Section three of the act was as follows: "Be it further enacted, That it shall become the duty of the Governor to submit such amendment to the people at said election in the following form: That those voting in favor of said proposed amendment shall have written or printed on their tickets, 'In favor of the ratification of the amendment to the Constitution creating the County of Wheeler, with the town of Alamo as the county site.' And those opposed to the ratification of said amendment shall have written or printed on their tickets, 'Opposed to the ratification of the amendment to the Constitution creating the County of Wheeler, with the town of Alamo as the county site,' which votes cast at said election shall be consolidated as now required by law in elections for members of the General Assembly, and returns thereon made to the Governor; and if a majority of the electors qualified to vote for members of the General Assembly shall vote in favor of the ratification of the amendment to the constitution creating the County of Wheeler, with the town of Alamo as the county site, the Governor shall declare said amendment adopted and make proclamation of the result of said election in the manner provided by law." The act received the requisite number of votes in both branches of the legislature, and, after approval by the Governor, was duly submitted to be voted upon at the November election, 1912, which was held on the Tuesday after the first Monday in November, being the time provided by law for the holding of elections for members of Congress and presidential electors. At such election the requisite number of votes were cast for the amendment, and the Governor declared the amendment adopted and issued his proclamation to that effect. The point is raised by the applicant for the writ of habeas corpus that the November election was not a general election within the contemplation of article 13, section 1, paragraph 1, of the constitution of this State (Civil Code, § 6610), and therefore that the sub-

mission of the proposed amendment to the constitution to the voters at the November election was without constitutional authority, and the effort to create the County of Wheeler in the manner stated was violative of both provisions of the constitution above cited. That part of the constitution contained in Civil Code § 6610 was adopted at the constitutional convention of 1877, and was as follows: "Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and if the same shall be agreed to by two thirds of the members elected to each of the two houses, such proposed amendment . . shall be entered on their journals, with the yeas and nays taken thereon. And the General Assembly shall cause such amendment or amendments to be published in one or more newspapers in each congressional district, for two months previous to the time of holding the next general election, and shall also provide for a submission of such proposed amendment or amendments to the people at said next general election; and if the people shall ratify such amendment or amendments by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment . . shall become a part of the Constitution. When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately." Under this law, amendments to the constitution of the character now under consideration are required to be submitted at the "next general election" to all of the voters of the State for ratification or rejection. The question raised is whether the November election is a "general election" within the meaning of article 13, section 1, paragraph 1, of the constitution. Before the adoption of the constitution of 1877 the constitution of 1868 declared, "This Constitution may be amended by a two-thirds vote of two successive legislatures, and by a submission of the amendment to the qualified voters for final ratification." In that instance the constitution did not specify how a proposed amendment to the constitution should be submitted to the people, or the kind of election at which the question should be submitted. Those matters were left open to be dealt with by the legislature. Under that constitution the question of the adoption of the amendment might have been submitted to the voters of the State at a special election regularly provided for that purpose by the legislature, or at any general election as the legis-

lators might see fit to ·direct. When the constitutional convention of 1877 dealt with the same matter, there was a material departure, in that a proposed amendment was not required to be voted for at two successive sessions of the legislature, and, additionally, to be submitted to the voters of the State at any election; but the requirement was that the proposed amendment should receive a specified vote at one session of the legislature, and that the proposed amendment should be submitted to the voters at "the next general election." In 1868 and in 1877 the conventions, upon adjournment, were to go out of existence. The necessity for possible amendments to the constitution then being adopted was in the mind of the members of the convention, who had been elected by the people, and in each instance it was deemed proper to make provision for such amendment without another convention; but in doing so care was taken that no amendment should be made without being submitted to the voters of the State for ratification. As indicated above, in 1868 the time and manner of submitting the question was not specified in that constitution, but in 1877 it was. In the latter constitution it was to be submitted at the next general election. The term "general election" was not defined, but that term, as employed, evidently contemplated an election to be held at a fixed time after a specified notice at which all the qualified voters of the State should have an opportunity to express their choice on the question of ratification of the amendment. Owing to the gravity of the question to be voted on, a full expression of the voters was desired. If submitted at a "general election," after. notice to the people as provided, the tendency would be to have a fuller vote than at a special election where the only question to be voted on was that of the adoption of the amendment. Other consistent reasons might be suggested for providing that the question should be voted on at a general election. The designation of the "next" general election was merely to fix the time for submission to the voters, taking into consideration the existing conditions.

When the constitution of 1877 was adopted, the act approved August 20, 1872 (Acts 1872, p. 29), was in effect. By this act it was provided, that elections for members of Congress and presidential electors should be held bienially on Tuesday after the first Monday in November; that elections for county officers should be

held on the first Wednesday in January of the years in which, under the constitution and laws of the State, elections should be held to fill such offices; and lastly, that elections for all other officers of this State should be held on the first Wednesday in October. Each of the three classes of elections mentioned was required to be held on the same day in each county of the State, and the qualification for voters was the same for all of them. Each election, therefore, was a general election throughout the State, and all voters qualified to vote at them were qualified to vote on the adoption of the constitutional amendment. Proper submission to the voters of the State was the object sought. That object could be accomplished in any one of the three elections above mentioned, which might happen to occur at a time when it was practicable to publish the notice required. The elections were all State elections, and no reason appears why the question of ratification should not be submitted at one class as well as another. There was no fixed date at which a proposed amendment might be submitted, and what might be the "next general election" after the adoption and approval of the act, occurring at a time when the notice could be given, would be indefinite. It could be one or the other of the three general elections. Under these circumstances, the framers of the constitution, without attempting to specify one class of the elections rather than the other, merely provided that the question should be submitted at the "next general election" occurring at a time when the notice of the submission of the proposed amendment to the constitution could be duly published.

Counsel for plaintiff in error insist that the election contemplated in art. 13, sec. 1, par. 1, of the constitution of 1877, to which the question of amendment should be submitted, was intended to apply only to the October election, rather than the November election; but we fail to see any ground for this contention. To give the constitution this construction would also eliminate the January election; yet at the January election, as well as the November election, there would be the same facilities for expression by the voters of the State, and probably as large a vote as if it were submitted at the October election. Under these views, it was proper to submit for ratification the proposed amendment to the constitution, for the purpose of creating the County of Wheeler, at the November election. See Allen v. State (Ariz.), 130 Pac. 1114, 44 L. R. A. (N. S.) 468.

2. It was urged that the creation of Wheeler County in the manner indicated above was violative of art. 11, sec. 2, par. 1, of the constitution. So far as necessary to be stated, this provision of the constitution (Civil Code, § 6595) declares: "There shall be no more than one hundred and forty-five counties in this State: Provided, however, that in addition to the counties now provided for by the constitution there shall be a new county laid out from the counties of Irwin and Wilcox, to be known as Ben Hill County." This contention of counsel for plaintiff in error is based on the fact that the creation of Wheeler County would add another county to the already existing one hundred and forty-five counties, limited as above; and it is insisted that before an amendment could be submitted to create Wheeler County, it would be necessary to change the limitation restricting the number of counties in this State. There is no basis for these contentions. The ratification of the amendment for the creation of Wheeler County makes that amendment a part of the constitution, and places in the proviso a new county. To that extent it modifies the provision of the constitution limiting the number of counties to one hundred and forty-five.

3. The grounds urged for the discharge of the prisoner upon the writ of habeas corpus were insufficient for the grant of that relief, and the judge committed no error in refusing to discharge him.

*Judgment affirmed. All the Justices concur.*